UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|

MID-CENTURY INSURANCE COMPANY a/k/a    |    Case No. 1:09-cv-220
Farmers Insurance Company, and

FARMERS INSURANCE EXCHANGE,

     Plaintiff,

          v.                 |    HONORABLE PAUL L. MALONEY

JIM A. FISH, ANETA PRYOR, KEITH PEPIN, and
GARY SEQUR, and

CINDY HARRINGTON, ROBBIN HARRINGTON,
ROBERT JONES, CYNTHIA JONES,
JIM HOFF, STEVE EBERHARD, JEFFREYC RIPE,[1] and

THE BLACK RIVER YACHT CLUB,

     Defendants.

.................................................................................

JIM A. FISH,

     Counterclaim-Plaintiff,

_____

[1]

The Magistrate Judge entered default against these seven individual defendants in August 2009, *see* Docs 40-46, and they have never sought to vacate those defaults: Cindy Harrington, Robbin Harrington, Robert Jones, Cynthia Jones, Jim Hoff, Steve Eberhard, and Jeffrey Cripe.

The complaint also names "Tom Shouldice" as a defendant, but there is no proof in the record that he has been served with Mid-Century's complaint and a summons. *See* Doc 32 (Magistrate's August 17, 2009 entry refusing, on this ground, to enter default against Shouldice).

Accordingly, only five defendants have filed answers to Mid-Century's declaratory-judgment complaint and have not been defaulted: Jim A. Fish, Aneta Pryor, Gary Sequr, Keith Pepin, and the Black River Yacht Club.

v.                                                    |
                                                      |
MID-CENTURY INSURANCE COMPANY a/k/a                   |
Farmers Insurance Company, and                        |
                                                      |
FARMERS INSURANCE EXCHANGE,                            |
                                                      |
     Counterclaim-Defendants.                         |
                                                      |
_____

### OPINION and ORDER

**Granting in Part & Denying Without Prejudice in Part Fish's Motion for Summary Judgment:**
Granting Summary Judgment to Jim A. Fish
under Mid-Century Insurance Company's "Yacht Secure" Policy;

Denying Without Prejudice Jim Fish's Motion for Summary Judgment
under Farmers Insurance Exchange's Umbrella Policy;

**Denying Without Prejudice Farmers Insurance Exchange's Motion for Summary Judgment
under Its Umbrella Policy;**

**Vacating the Pretrial Conference and Trial *Sine Die***

This is a boat-insurance coverage dispute involving two policies issued by two separate insurers. For the reasons that follow, the court will grant summary judgment to the insured, Jim A. Fish ("Fish") on the "Yacht Secure" policy number FY-701132719 issued to him by Mid-Century Insurance Company ("Mid-Century"), due to the Mid-Century policy's failure to define crucial terms such as "safe berth afloat." The court will deny without prejudice the cross-motions for summary judgment on the umbrella policy issued to Fish by Farmers Insurance Exchange, due to the incomplete state of the record and the apparent existence of genuine issues of material fact.

<u>Background.</u> No party has contested the complaint's allegations regarding the State of residence and/or citizenship of the parties; until and unless some party does so, the court accepts

those allegations as true. According to Mid-Century's complaint, Mid-Century is a "foreign insurer", i.e., it is incorporated in a jurisdiction other than Michigan, which has its principal place of business in Los Angeles, California. *See* Comp ¶ 1. Of the twelve individual defendants, two are residents of Ohio (Robert Jones and Cynthia Jones) and ten are residents of Michigan (Fish, Pryor, Pepin, Robbin & Cyndy Harrington, Sequr, Hoff, Eberhard, Cripe and Shouldice), *see* Comp ¶¶ 2-12. Defendant Black River Yacht Club ("the Yacht Club") is a Michigan corporation with its principal place of business in Van Buren County, Michigan, *see* Comp ¶ 13. Mid-Century's complaint alleges, without contradiction from any party, that more than $75,000 is in controversy, exclusive of interest, attorneys fees, and costs. Accordingly, on the record as it stands, the court has diversity jurisdiction.

Fish applied to Mid-Century for a Yacht Secure insurance policy, and he signed an application which identified a "layup period" from October 1 of the policy year to April 1 of the policy year, *see* Comp ¶ 19 and Ex B (application). Mid-Century issued a policy to Fish for the coverage period May 17, 2008 through May, 2009 inclusive ("the policy"), and both this original policy and the subsequent renewal policy contained a layup warranty consistent with a layup period of October 1-April 1 of the policy year, *see* Comp ¶¶ 18 and 20 and Ex A (policy). As to Fish's 42-foot 5-inch 1973 Trojan yacht, Section I of the policy, entitled Property Insurance, provided coverage "against direct accidental physical loss or damage and any loss caused by a latent defect in the insured yacht, except as otherwise excluded, while the covered property is afloat or ashore within the navigational limits specified on the Declarations page . . . [.]" Comp ¶¶ 21-22. **Policy Section II (Liability Insurance), Coverage E, entitled Protection and Indemnity, provides coverage as follows:**

We will pay damages caused by an occurrence to which this coverage applies for which the insured shall become legally obligated to pay arising out of the ownership, maintenance, or use of the insured yacht or non-owned yacht resulting in:

(1)     bodily injury; or
(2)     property damage; or
(3)     pollution.

We will pay the cost to remove or dispose of the wreck or the insured yacht or any reasonable attempt to do so, such removal as required by law.

We have the right and duty to defend the insured against any lawsuits seeking damage for which coverage applies. Our right and duty to defend ends when we have used up the applicable limit of insurance and the payment of judgments or settlements under Coverage E. We have no duty to defend the insured against any lawsuit seeking those damages resulting from bodily injury, property damage or pollution to which this insurance does not apply.

Comp ¶ 23. **The policy contains a Mariners' Choice Endorsement (Form No. 61-1233, January 2007) which amends the General Conditions applicable to all coverages as follows:**

3.     Lay-up

This section is amended to read as follows:

There is no coverage under this policy if the insured yacht is being occupied or navigated during the lay-up period specified on the Declarations Page. If the insured yacht is laid up for the period specified on the Declarations Page, the following conditions apply:

a)     The insured yacht is warranted to be laid up and out of commission ashore or in a safe berth afloat.

b)     The insured yacht is warranted to not be occupied for recreational purposes.. However, if you are required to occupy the insured yacht for the purposes of safety, repairs, alteration or for betterments and improvements, not to exceed two overnight stays within any thirty-day period, coverage will not be suspended;

c)     The insured yacht is warranted to not be available for immediate navigation. However, if you are required to move the insured yacht within the immediate berthing location for the purposes of safety, repairs, alterations or for betterments and improvements, coverage will not be suspended; and

d) The insured yacht is warranted not to be used as a live-aboard.

Comp ¶ 24. The policy's declarations page provides that the yacht will be laid up ashore from October 1 to April 1 at J&B Landing, 750 East Wells Street, in South Haven, Michigan, *see id.* ¶ 25.

**On October 5, 2008, Fish, Pryor and Pepin went to the yacht club in order to operate Fish's yacht**, *see* Comp ¶ 28. While preparing the yacht for use, Pepin tried to load fuel but accidentally placed the fuel into the hull rather than the appropriate tank, *id.* ¶ 29. When Pepin's error was discovered, the fuel was redirected into the proper opening, *id.* ¶ 30. When Fish attempted to connect a portable fuel pump to the boat battery, an explosion occurred, causing bodily injury to Fish, Pepper, Pryor and Eberhard; destroying Fish's yacht; and damaging boats and boat wells owned by the Harringtons, Sequr, Hoff, Eberhard, Cripe, the Joneses, and the yacht club, *id.* ¶¶ 31-33. Plaintiff Mid-Century agrees with the physical details of the accident, and it acknowledges that Fish's yacht was destroyed. *See* Plaintiff/Counterclaim-Defendant Mid-Century's Answer to Counterclaim filed June 25, 2009 (Doc 22, "Mid-Century Ans to Counterclaim") ¶¶ 14-15.


Procedural History, Claims, and Counterclaim.

**Mid-Century filed this declaratory-judgment action in March 2009.** In count one, mid-Century seeks a declaration that it owes no duty to indemnify Fish for damage to his boat from the October 5, 2008 explosion because he violated the policy's lay-up warranty, which required the yacht to be out of the water and non-operational at that time. *See* Comp ¶¶ 35-36. In count two, Mid-Century seeks a declaration that it owes no duty to defend or indemnify Fish for any claims of bodily injury or property damage from the October 5, 2008 explosion, again because he violated the policy's lay-up warranty by occupying the yacht for recreational purposes and making it available

for immediate navigation.  *See* Comp ¶¶ 38-40.

Defendant Fish, the yacht owner and the insured, counters that on the day of the accident, he intended to board and move the boat only to "winterize" it and move it "within the immediate berthing location for the purposes of safety, repairs, alterations or for betterments and improvements to J&B Landing . . . which is approximately 75-100 yards from where the watercraft was berthed at the Black River Yacht Club."  Def Fish's Counterclaim (Doc 17) ¶ 13.  Defendant Fish asserts a counterclaim against Mid-Century to recover monetary payment for the bodily injury and property damage which he and other defendants allegedly sustained as a result of the accident.  *See* Def Fish's Counterclaim ¶¶ 12-16 (Count One) and Prayer for Relief ¶¶ A-C.  Defendant Fish also asserts a counterclaim against third-party defendant Farmers Insurance Company and/or third-party defendant Zurich American Insurance Company (collectively "Farmers"), pursuant to a general-liability "personal umbrella policy" number 600-535195, for payment for bodily injuries and property damage which he and other defendants allegedly sustained as a result of the accident.  *See* Def Fish's Counterclaim ¶¶ 17-19 (Count Two) and Prayer for Relief ¶¶ A-C.

In its answer to Fish's counterclaim, Mid-Century contends that its alleged parent and/or affiliate companies – Farmers Insurance Company, Foremost Insurance Company, and Zurich Insurance Company – are irrelevant because they did not issue the policy on which this action is based, and must be sued in their independent separate capacities, either directly or via a third-party complaint.  *See* Mid-Century Ans to Counterclaim ¶ 2.   *See* Mid-Century Ans to Counterclaim, Affirmative Defenses 1 and 2.

In August 2009, defendant Fish filed a "first amended countercomplaint" against Mid-Century and "Farmers Group, Inc."  *See* Doc 50.  Fish's "first amended countercomplaint" alleges

that Farmers Group, Inc., is a "foreign insurer," i.e., that it is incorporated in a jurisdiction other than Michigan, with its principal place of business in Nevada. *See* Doc 50 ¶ 1.

Service of Counterclaim-Defendant Farmers Insurance Exchange. Fish's August 31, 2009 "first amended countercomplaint" attached a summons directed to Farmers Group, Inc. in care of CSC Lawyers Incorporating Service at an address in East Lansing, Michigan. *See* Doc 50, Ex 2. The summons was issued as to Farmers Group, Inc. on September 17, 2009, *see* unnumbered docket entry after Doc 55. On October 23, 2009, the Magistrate Judge granted a joint stipulation to correct the name of counterclaim-defendant Farmers Group, Inc. to Farmers Insurance Exchange, *see* Docs 59-60. Mid-Century and Farmers Insurance filed separate answers to the first amended counterclaim, *see* Docs 52 and 64. Farmers Insurance attaches a copy of the umbrella policy which it issued to Fish (Doc 64-1), but it denies that the policy obligates it to defend or indemnify him.

Default Entered Against 7 of 12 Individual Defendants. Acting on plaintiff Mid-Century's August 17, 2009 applications, the Magistrate Judge entered default against seven individual defendants on August 18, 2009: Cripe, Robbin Harrington, Cindy Harrington, Robert Jones, Cynthia Jones, Jim Hoff, and Steve Eberhard. *See* Docs 4-10 (acknowledgments of service by these seven defendants); Docs 33-39 (Mid-Century's applications for entry of default against these seven defendants); Docs 40-46 (entries of default against these seven defendants). Mid-Century, however, has never moved for the entry of default judgment against those seven defendants.

So far as the record reflects, Tom Shouldice has never been served, so the court does not consider him to be a party defendant. The other four individual defendants filed answers to Mid-Century's complaint (Docs 13, 16, 18 and 29), as did the Black River Yacht Club (Doc 25).

**LEGAL STANDARD:**
**FEDERAL COURT'S APPLICATION OF STATE LAW**

When sitting in diversity jurisdiction, this court must apply the choice-of-law rules and, if applicable, the substantive law of the forum State, Michigan. *Amerisure Mut. Ins. Co. v. Carey Transp., Inc.*, 578 F. Supp.2d 888, 897 (W.D. Mich. 2008) (Paul L. Maloney, C.J.) (citing *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409-10 (6th Cir. 2008) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003))); *see also Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("We generally apply the substantive law of the forum state to actions brought pursuant to our diversity jurisdiction.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). This rule applies in insurance-coverage actions brought in diversity. *See Amerisure*, 578 F. Supp.2d at 897 (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 563 (6th Cir. 2008) (citation omitted)).

When interpreting contracts in a diversity action, the federal courts also generally enforce the parties' contractual choice of governing law. *Amerisure*, 578 F. Supp.2d at 897 (citing *Savedoff*, 524 F.3d at 762 (citing *Carnival Cruise Lines, Inc. v. Schute*, 499 U.S. 585, 596 (1991) and *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972))). As the parties do not dispute that this insurance coverage dispute is governed by Michigan substantive law, the court applies Michigan law. *See, e.g., Savedoff*, 524 F.3d at 762 ("As the parties do not dispute that the student loan contracts at issue are governed by Ohio law, we apply Ohio law to the parties' contractual dispute."); *Lakeland Reg. Health Sys. v. Walgreen's Health Initiatives, Inc.*, 604 F. Supp.2d 983, 986 (W.D. Mich. 2009) (Maloney, C.J.) (although the contract at issue had a choice-of-law clause calling for the application of Illinois substantive law, "WHI contends that Michigan law governs the tort issues in this case . . . and plaintiff Lakeland's brief also proceeds under Michigan law. Accordingly, the court will apply Michigan law to the determination of whether Lakeland has a cognizable tort cause

of action against WHI."); *State Farm Fire & Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 2009 WL 702863, *4 (W.D. Mich. Mar. 16, 2009) ("As the parties do not dispute that the interpretation of the policies is governed by Michigan substantive law, the court applies Michigan law to this dispute."); *Amerisure*, 578 F. Supp.2d at 897 ("As the parties do not dispute that the Amerisure-Carey policy is governed by Michigan substantive law, the court applies Michigan law to this dispute.").

## A FEDERAL COURT'S APPLICATION OF STATE LAW

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, 602 F. Supp.2d 829, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Richard Allen Griffin, J.) (citation omitted)). If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts: "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'" *ARS*, 602 F. Supp.2d at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)); *see also West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances the federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court . . . ."), *followed by Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) and *Dairy, Bakery & Food Workers*

*Local Union No. 386 v. Grand Rapids Milk Div.*, 160 F. Supp. 34, 39 (W.D. Mich. 1958) (Kent, J.).

In determining the controlling law of the State, a federal court "*may* give weight" to the decisions of a State trial court, *Lakeland Reg. Health Sys. v. Walgreens Health Initiatives, Inc.*, 604 F. Supp.2d 983, 989 (W.D. Mich. 2009) (citing *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975)), especially when it is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605. But the federal court is not *obligated* to follow state trial-court decisions. *See Krakoff v. US*, 431 F.2d 847, 849 (6th Cir. 1970) ("a federal court is not bound by the decision of state lower court where there has been no determination of a question of state law by the state's highest court.") (citing *CIR v. Bosch*, 387 U.S. 456 (1967)); *see also Gray v. Green Tokai Co., Ltd.*, 2007 WL 1026425, *3 (S.D. Ohio Mar. 30, 2007) (Thomas Rose, J.) ("Lower state court decisions are not binding on federal courts seeking to decide an issue of state law if the federal court is convinced that the highest state court would decide otherwise.") (citing *Woods v. Vermillion Local Sch. Dist.*, 1999 WL 652019, *2 (N.D. Ohio Aug. 9, 1999) (James Carr, J.)) (other citations and internal quotation marks omitted).[2]

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *See ARS*, 602 F. Supp.2d at – (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision

---

[2]

    *Accord Am. Int'l Ins. Co. of P.R. v. Lampe GmbH*, 307 F. App'x 645, 647 (3d Cir. 2009) (citing *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 199 (3d Cir. 2004)).

would receive in that state's court system under the peculiarities of New Jersey law."))  If a state court would not be bound by a particular state-court decision, then neither is this court.  *ARS*, 602 F. Supp.2d at – (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis."  This subsection makes no distinction based on when the decision was issued..  *ARS*, 602 F. Supp.2d at –.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule."  *ARS*, 602 F. Supp.2d at – (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued.  *ARS*, 602 F. Supp.2d at –.  When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails.  *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue.  *ARS*, 602 F. Supp.2d at – (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.

2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, 602 F. Supp.2d at – (citing *Iqbal v. Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing MICH. CT. R. 7.215(J)(1))). Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals. *See Republic-Franklin Ins. Co. v. Bosse*, No. 95-3401, 89 F.3d 835, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

**Finally, a federal court's interpretation of state law is not binding.** *ARS*, 602 F. Supp.2d at – (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")); *accord McGrath v. Toys 'R Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996)); 20 AM. JUR.2D COURTS § 225 (1965). As our Circuit has emphasized,

> No federal court has the final say on what [state] law means. Even the decision of the highest federal court, the United States Supreme Court, about the meaning of [a state] law has no more binding authority on the [state] Supreme Court than the decision of [another State's] Supreme Court or for that matter any other court.

*Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008); *see also Humphreys v. Bellaire*

*Corp.*, 966 F.2d 1037, 1042 (6th Cir. 1992) ("the district court's reliance on federal cases interpreting Ohio law is only correct if those cases accurately reflect the law of Ohio") (citation omitted).

Accordingly, this court will seriously consider our Circuit's interpretation of state law, or another district court's interpretation of state law, but is not bound by it. *See ARS*, 602 F. Supp.2d at –; *see also Pack v. Damon Corp.*, 2006 WL 1156489, *1 (E.D. Mich. May 1, 2006) ("Michigan courts, in turn, are not bound by the Sixth Circuit's interpretation of Michigan law."). *See, e.g., MPAS v. Michigan DOC*, 581 F. Supp.2d 847, 856 (W.D. Mich. 2008) (Maloney, C.J.) (declining to follow U.S. District Court for the Eastern District of Michigan's determination that MDOC is a political subdivision of the State of Michigan, a matter of state law).

## LEGAL STANDARD: SUMMARY JUDGMENT

"Summary judgment is proper if the 'pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Portinga v. Taylor*, 2009 WL 910800, *5, – F. Supp.2d –, – (W.D. Mich. Apr. 2, 2009) (Maloney, C.J.) (quoting *Patterson v. Hudson Area Schools*, 551 F.3d 438, 444 (6th Cir.) (quoting FED. R. CIV. P. 56(c)), *cert. denied*, – U.S. –, 130 S.Ct. 299 (2009); *see also Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009).[3] *Accord Alderman v. JC Dev. Communities, LLC*, 2009 WL 2607084, *1 (Mich. App. Aug.

---

[3]

Before the December 2007 amendment, FED. R. CIV. P. 56(c) stated that summary judgment is appropriate if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Appalachian Railcar Servs., Inc. v. Consumers Energy Co.*, 602 F. Supp.2d 829, 845 (W.D. Mich. 2008) (Maloney, J.) ("ARS") (quoting *Conley v. City of Findlay*, 266 F. App'x 400, 404 (6th Cir. 2008) (Griffin, J.)).

The amendment was stylistic only. *Portinga v. Taylor*, 2009 WL 910800, *5 n.9 (W.D.

25, 2009) (p.c.) (P.J. Owens, Servitto, Gleicher) ("Summary disposition is proper when, upon examining the pleadings, admissions and other evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.") (citing *Brown v. Brown*, 739 N.W.2d 313, 316 (Mich. 2007)).

The movant has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F. App'x at 404 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial – e.g., if the movant is defending against a claim – "it may meet its burden merely by showing 'that there is an absence of evidence to support the moving party's case.'" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Celotex*, 477 U.S. at 323), *reh'g & reh'g en banc denied* (6th Cir. Oct. 23, 2009). *See also Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, its initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . .") (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, No. 99-2113, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000). *Accord Claspell v. Denso Mfg. Michigan, Inc.*, 2001 WL 1545684, *2 (Mich. App. Dec. 4, 2001) (p.c.) (P.J. O'Connell, Sawyer, Smolenski) ("That standard is exactly the same as the standard for summary disposition used under Michigan law . . . .").

Once the movant has met its burden, the non-movant must present "'significant probative

Mich. Apr. 2, 2009) (Maloney, C.J.) (citing *Dobrowiak v. Convenient Family Dentistry, Inc.*, 315 F. App'x 580, 584 n.4 (6th Cir. 2009) (citing FED. R. CIV. P. 56(c), Adv. Comm. Notes))).

evidence'" to demonstrate that there is more than "'some metaphysical doubt as to the material facts.'" *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F. App'x at 404 (quoting *Moore*, 8 F.3d at 339-40)). The non-movant may not rest on the mere allegations of his pleadings. *See Griffin v. Reznick*, 609 F. Supp.2d 695, 698 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, FED. R. CIV. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)); *see also Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, 306 F. App'x 273, 278 (6th Cir. 2009); *accord Kachudas v. Invaders Self Auto Wash, Inc.*, 2009 WL 2767303, *2 (Mich. App. Sept. 1, 2009) (p.c.) (P.J. Wilder, Cavanagh, Murray) ("When the burden of proof at trial would rest on the non-moving party, the nonmovant may not rest upon mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial.") (citing *The Healing Place at No. Oakland Ctr. v. Allstate Ins. Co.*, 744 N.W.2d 174, 177 (Mich. App. 2007) (citing, *inter alia*, *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 317 (Mich. 1996))).[4]

If the movant puts forward evidence – such as affidavits, purported business records, purported government records, etc. – the other party cannot withstand summary judgment by simply sitting mute and failing to challenge the authenticity, admissibility, or veracity of those documents. *See Leys v. Lowe's Home Ctrs., Inc.*, – F. Supp.2d –, –, 2009 WL 3255597, *2 (W.D. Mich. 2009) (Maloney, C.J.) (citing *Donoho v. Smith Cty. Bd. of Ed.*, 21 F. App'x 293, 298 (6th Cir. 2001) (Boggs, J.) (affirming summary judgment for employer, Circuit noted that plaintiff's "affidavit does nothing to challenge the evidence put forward by the defendants that the last IEP meeting . . . also

---

[4]

However, "[a] *verified* complaint 'carries the same weight as would an affidavit for the purposes of summary judgment." *ACLU of Ky. v. Grayson Cty., Ky.*, – F.3d –, –, 2010 WL 114361, *3 (6th Cir. Jan. 14, 2010) (McKeague, J., joined by D.J. Forester) (citing, *inter alia*, *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008)) (emphasis added).

included provision to her of the apparently usual verbal and written notices of her rights.")).

Moreover, the mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; there must be some genuine issue of *material* fact. *ARS*, 602 F. Supp.2d at 845 (citing, *inter alia*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986))). And the non-movant "cannot defeat a properly supported motion for summary judgment motion by 'simply arguing that it relies solely or in part upon credibility determinations.'" *Heggie v. Kuzma*, 2009 WL 594908, *10 (W.D. Mich. Mar. 6, 2009) (Maloney, C.J.) (quoting *Fogerty v. MGM Group Holdings, Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (non-movant may not "have a trial on the hope that a jury may disbelieve factually uncontested proof")).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert. denied*, – U.S. –, 128 S.Ct. 1334 (2008),[5] and view the evidence in the light most favorable to the non-movant, giving it the benefit of all reasonable inferences. *Fox v. Eagle Dist. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (Griffin, J.); *see also Patterson*, 551 F.3d at 445.

But the court considers its evidence only to the extent that it would be admissible at trial. *See Elliott Co. v. Liberty Mut. Ins. Co.*, 2009 WL 750780, *10 (6th Cir. Mar. 23, 2009) (Moore, <u>Clay</u>, Kethledge) (on appeal from grant of summary judgment, panel declined to consider extrinsic evidence which would not be admissible under applicable state contract law) (citation omitted); *Bond v. Burson*, No. 96-5459, 134 F.3d 370, 1998 WL 24993, *4 (6th Cir. Jan. 16, 1998) ("The district court also acted within its discretion in denying plaintiff's motion to strike the Smith

---

[5] *Accord Fall v. Loudon*, 2008 WL 375989, *6 (Mich. App. Feb. 12, 2008) (citing *Dolan v. Continental Airlines/Continental Express*, 563 N.W.2d 23, 26 (Mich. 1997)).

affidavit from defendants' summary judgment motion.  By relying upon the affidavit only for the purposes of establishing the history of the case and DHS's custody of plaintiff, the court properly disregarded those facts not admissible at trial.").

Ultimately, entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party w[ould] bear the burden of proof at trial." *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir. 2007) (quoting *Celotex*, 477 U.S. at 322).[6]  "As Chief Judge Bell has characterized the post-trilogy summary-judgment standard, '[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial.'" *Ellis v. Kaye-Kibbey*, 581 F. Supp.2d 861, 874 (W.D. Mich. 2008) (Maloney, C.J.) (quoting *Wilson*, 112 F. Supp.2d at 654); *see also Townsend v. US*, 2000 WL 1616081, *1 (W.D. Mich. Aug. 31, 2000) (McKeague, J.); *Eckford-El v. Toombs*, 760 F. Supp. 1276, 1268 (W.D. Mich. 1991) (Hillman, J.).

**DISCUSSION:**
**Mid-Century Policy is Ambiguous and Must Be Construed in Favor of the Insured.**

---

[6]

A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances . . . ."  *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988).  *Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims."); *Hurst v. Union Pacific Rail Co.*, 1991 WL 329588, *1 (W.D. Okla. 1991) ("This trilogy of cases establishes that factual and credibility conflicts are not necessarily enough to preclude summary judgment and encourage that a summary judgment be used to pierce the pleadings and determine if there is in actuality a genuine triable issue."), *aff'd*, 958 F.2d 1002 (10th Cir. 1992); *Bowser v. McDonald's Corp.*, 715 F. Supp. 839, 840 (S.D. Tex. 1989) (the trilogy "encouraged federal district courts to use summary judgment more frequently and economically by changing the movant's burden of production . . . and by allowing qualitative review of evidence") (citations omitted).

Page 3 of the so-called Mariners Choice Endorsement of the Mid-Century policy contains an unnumbered, unlettered section entitled "General Conditions Applicable to All Coverages." In pertinent part, this section provides as follows:

3.      Lay-up

This section is amended to read as follows:

There is no coverage under this policy if the insured yacht is being occupied or navigated during the lay-up period specified on the Declarations Page. If the insured yacht is laid up for the period specified on the Declarations Page, the following conditions apply:

a)      The insured yacht is warranted to be laid up and *out of commission ashore or in a safe berth afloat.*

b)      *The insured yacht is warranted to not be occupied for recreational purposes.. However, if you are required to occupy the insured yacht for the purposes of safety, repairs, alteration or for betterments and improvements*, not to exceed two overnight stays within any 30-day period, *coverage will not be suspended*;

c)      *The insured yacht is warranted to not be available for immediate navigation, however, if you are required to move the insured yacht within the immediate berthing location for the purposes of safety, repairs, alterations or for betterments and improvements[,] coverage will not be suspended*; and

d)      The insured yacht is warranted not to be used as a live-aboard.

Comp, Ex. A. The policy's declarations page provides as follows, in pertinent part:

PRIMARY MOORING          Lay-up Type:  ASHORE
J & B Landing            Lay-up State:  MI
750 E Wells St           Lay-up Warranty: Warranted that the Yacht shall be
South Haven, MI 49090    laid up and out of commission From 10/01 To 04/01

SECONDARY MOORING        Lay-Up Location
[blank]                  750 E Wells St
                         South Haven, MI 49090

Comp, Ex. A, Yacht Secure Policy Declarations page. Fish acknowledges that at the time of the

accident, his yacht was not "out of commission ashore" (the first of two ways to satisfy the lay-up requirement without the need for further evidence). Fish reasons, however, that at the time of the accident, his yacht was "in a safe berth afloat" (the second of two ways to satisfy the lay-up requirement).

The lay-up requirement took effect on October 1, and the accident occurred on October 5. Thus, to compel coverage, Fish must show that he complied with the lay-up requirement, which is plainly a condition precedent to coverage. By the plain terms of the Mid-Century policy's Lay-up provision (as amended by the Mariners Choice Endorsement), Fish contends, his yacht was in compliance with the lay-up provision because it was "in a safe berth afloat." At oral argument, Mid-Century responded that at the time of the accident, Fish did not have his yacht at the "primary mooring location" specified by the Declarations Page to wit: J&B Landing. Fish admits this because he explains that he was fueling the yacht in order to move it from the Black River Yacht Club to J&B Landing. Mid-Century also emphasizes that the Declarations Page unequivocally states "Lay-Up Type: Ashore."

**For several reasons, Mid-Century's position is untenable under established Michigan common law governing insurance contracts. First, none of the potentially dispositive documents – the Yacht Secure Policy proper, its attached endorsements or riders, or the accompanying Policy Booklet – defines "safe berth afloat."** *See generally Royal Property Group, LLC v. Prime Ins. Syndicate, Inc.*, 267 Mich. App. 708, 715, 706 N.W.2d 426, 432 (Mich. App. 2005) ("The policy application, declarations page of [the] policy, and the policy itself construed together constitute the contract.") (citing *Hall v. Equitable Life Ass. Soc'y of the US*, 295 Mich. 404, 408, 295 N.W.2d 204, 206 (Mich. 1940)); *see* Comp Ex A, Yacht Secure Policy Booklet at 3

(Definitions). Normal prudence and foresight could and should have led Mid-Century to expressly define "safe berth afloat" and/or give examples of what does or does not constitute such a berth.

**Second, under the circumstances, the court cannot reliably ascertain the relevant "commonly understood" meaning of the policy term "safe berth float" by reference to sources other than the policy documents.** Nonetheless, an insurance policy's failure to define a relevant term does not *necessarily* render the policy ambiguous. *See Liparoto Const., Inc. v. General Shale Brick, Inc.*, 284 Mich. App. 25, 35, 772 N.W.2d 801, 807 (Mich. App. 2009) (citing *Citizens Ins. Co. v. Pro-Seal Serv. Group, Inc.,* 477 Mich. 75, 82-83, 730 N.W.2d 682, 686 (Mich. 2007)). When reasonably possible, Michigan appellate courts confronted with a term which is not defined by an insurance policy must "interpret the terms of the policy in accordance with their commonly used meanings." *Liparoto Const.,* 284 Mich. App. at 35, 772 N.W.2d at 807 (citing *Citizens Ins. Co.,* 477 Mich. at 82-83, 730 N.W.2d at 686). Even assuming *arguendo* that the Michigan Supreme Court would have no difficulty defining "berth" and "afloat" by reference to their commonly understood meanings beyond the four corners of the policy, it is not possible to define "safe" by this method.

"[C]ourts may 'refer to dictionary definitions when appropriate when ascertaining the precise meaning of a particular term.'" *Spight v. Kendrick*, 2007 WL 914647, *1 (Mich. App. Mar. 27, 2007) (per curiam) (P.J. Zahra, Bandstra, Owens) (quoting *Morinelli v. Provident Life & Acc. Co.*, 242 Mich. App. 255, 262, 617 N.W.2d 777, 781 (Mich. App. 2000) (citing *Popma v. Auto Club Ins. Ass'n*, 446 Mich. 460, 470, 521 N.W.2d 831, 836 (Mich. 1994))). The Merriam-Webster Dictionary Online defines "safe", in pertinent part, as "free from harm or risk" or "secure from threat of danger, harm or loss" or "affording safety or security from danger, risk, or difficulty." *See* http://www.merriam-webster.com/dictionary/safe retrieved August 25, 2010 (definitions 1, 2a and

3). The Cambridge Advanced Learner's Dictionary Online defines "safe" as "not in danger or likely to be harmed." *See* http://dictionary.cambridge.org/dictionary/british/safe_1 retrieved August 25, 2010 (first unnumbered definition). The New World College Dictionary Online defines "safe" as "free from danger, damage, or injury; secure" or "giving protection" or "involving no risk." *See* http://www.yourdictionary.com/safe retrieved August 25, 2010 (definitions 1a, 2a and 2b).

Oral argument illustrated precisely why dictionary definitions of "safe" cannot resolve the ambiguity inherent in the word in this particular context. For example, it might be "safe" to have the yacht in a berth afloat in southern Michigan on a particular day after October 1 and before April 1 (the lay-up period), but *not* "safe" to have the same yacht afloat on Lake Superior in the Upper Peninsula several hundred miles to the north, due to the characteristic disparity in average water temperatures in the two regions. Moreover, while it might *generally* be safe to have this vessel in a berth afloat on the Black River on October 5th, it might not be safe to do so if air and water temperatures were running unseasonably low at that time. Conversely, while it might generally be *un*safe to have this vessel in a berth afloat on the Black River in, say, February, it might *in fact* be safe to do so if air and water temperatures had been running consistently unseasonably high up to and including the day in question. Any definition which cannot render insignificant the vagaries and uncertainties of location and weather patterns cannot be said to dispel the ambiguity of the word.

Nor can it be said that the policy's specification of lay-up start and end dates avoids such fact-intensive inquiries. The policy itself expressly authorizes the insured to keep the vessel in "a safe berth *afloat*", i.e. not "ashore", *during the lay-up period*, under certain circumstances and for certain purposes. Under the circumstances of the explosion of Fish's yacht, then, resort to the "commonly understood" meanings of the words in the term "safe berth afloat" cannot rectify Mid-

Century's failure to define the term. *See generally West American Ins. Co. v. Anmar Shell Investors, LLC*, 2008 WL 2745967, *1 (Mich. App. July 15, 2008) ("[A]ny ambiguous terms are given their plain and commonly understood meanings *as much as possible*.") (citing *So. Macomb Disposal Auth. v. American Ins. Co.*, 225 Mich. App. 635, 653, 572 N.W.2d 686, 695 (Mich. 1997)) (emphasis added).

**Third, the Declarations Page's specification of J&B Landing as the yacht's "primary mooring location" is of no avail to Mid-Century's attempt to sustain its position, when drafting the policy to clearly define "safe berth afloat."** The Declarations Page identifies J&B Landing only as the *primary* mooring location, not the *exclusive* mooring location. The word "primary" necessarily recognizes that there is at least one other permissible mooring location, i.e., a "secondary" or "alternate" mooring location. As the drafter of the policy, Mid-Century could have specified J&B Landing as the "exclusive" mooring location, but it did not, and it must live with the consequence of that choice or oversight. *Cf. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Continental Illinois Corp.*, 673 F. Supp. 300, 305 (N.D. Ill. 1987) ("If Harbor had in fact chosen to draft the Policy that way, a 'loss' sustained in one year could have been attributable to another year in defining Harbor's maximum exposure under Policy Paragraph 5(B) . . . . But Harbor did not do that, and the necessary result is that it must live with the consequences.").

**Fourth, the Declaration Page's specification "Lay-Up Type: Ashore" is of no avail to Mid-Century either**. On the contrary, by contradicting another policy provision, it establishes beyond cavil that the lay-up provision is ambiguous. The policy's mariner's endorsement clearly states that during the lay-up period, Fish had to keep the yacht *either* ashore *or* "in a safe berth afloat." To the extent that the Declarations Page purports to make "ashore" the only permissible

location for the vessel during the lay-up period, it flatly contradicts the mariner's endorsement. Namely, the Declarations Page's "Lay-Up Type: Ashore" suggests that Fish's loss is not covered, because his yacht was not ashore at the time of the explosion, while the Mariner Endorsement's "ashore or in a safe berth afloat" suggests that his loss is potentially covered. *See Farm Bureau Mut. Ins. Co. of Michigan v. Stark*, 437 Mich. 175, 181-82, 468 N.W.2d 498, 501-502 (Mich. 1991) (Robert P. Griffin, J., for the Court) ("If a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand [that] there is no coverage under the same circumstances, the contract is ambiguous and should be construed against its drafter and in favor of coverage.") (quoting *Raska v. Farm Bur. Ins. Co.*, 412 Mich. 355, 361-62, 314 N.W.2d 440 (Mich. 1982)), *overruled on other grounds by Smith v. Globe Life Ins. Co.*, 460 Mich. 446, 597 N.W.2d 28 (Mich. 1999).

Mid-Century has identified no way to reconcile the Mariners Endorsement and the Declarations Page on this score, and the court perceives none. *Contrast Helms v. Lemieux*, 486 Mich. 937, 937, 782 N.W.2d 503, 503 (Mich. 2010) ("The Court of Appeals erred by finding that there was a conflict between the annuity application and the annuity policy with regard to the annuitant status of the two signing applicants. Reading the contract as a whole, the interpretation that harmonizes all of the relevant language is . . . ."). As a matter of law, "[a] provision in a contract", such as the lay-up provision, "is ambiguous if it irreconcilably conflicts with another provision . . .", such as the Declarations Page's Lay-Up Type provision. *See Royal Property Group*, 267 Mich. App. at 715, 706 N.W.2d at 432 (citing *Lansing Mayor v. Pub. Serv. Comm'n*, 470 Mich. 154, 165 n.6, 166, 680 N.W.2d 840, 846 n.6, 847 (Mich. 2004) (Taylor, J., for the Court)).

In the absence of contractual, statutory, dictionary or Michigan case-law guidance as to the

plain, commonly understood meaning of the term "a safe berth afloat", the court predicts that the

Michigan Supreme Court would apply the well-established Michigan canon of construction that

ambiguities in an insurance policy must be construed in favor of the insured and against the insurer.

*See McNeel v. Farm Bureau Gen. Ins. Co. of Michigan*, – N.W.2d –, 2010 WL 2594636, *___

(Mich. App. June 29, 2010) (P.J. M.J. Kelly, K.F. Kelly, <u>Shapiro</u>) (citing *Henderson v. State Farm*

*Fire & Cas. Ins. Co.*, 460 Mich. 348, 354, 596 N.W.2d 190 (Mich. App. 1999)).   Applying that

canon, this court must assume *arguendo* that the location of the yacht at Black River Yacht Club *was*

a "safe berth afloat" – or at least, Mid-Century cannot be heard to argue otherwise when it drafted

the policy and failed to define the term when it could have done so.   Therefore, as a matter of law,

Fish as the insured is deemed to satisfy Lay-Up subsection (a).

     That does not necessarily end the coverage inquiry.   Mid-Century might also have invoked

Lay-up subsection (c),[7] which provides that the yacht "is warranted to not be available for immediate

navigation" unless the insured is "required to move the insured yacht within the immediate berthing

location for the purposes of safety, repairs, alterations or for betterments and improvements", in

---

[7]

The Lay-Up provision has four subsections.  The court has already addressed subsection (a).

Subsection (b) specifies when it is permissible to "occupy" the boat during the lay-up period. There is no allegation that Fish or anyone else "occupied" the boat on the day of the accident.  For example, subsection (b) refers to the number of overnight stays which constitute permissible "occupation", and there is no allegation that Fish stayed or planned to stay overnight on the boat after the lay-up period began.

Subsection (d) prohibits use of the boat as a "live-aboard."  There is no allegation that Fish used or planned to use the boat as a live-aboard during the lay-up period.

In any event, by failing to invoke Lay-up subsections (b) and (d) in its briefs – let alone its *opening* brief – Mid-Century waived any argument it might have had that those subsections justified its denial of coverage.

which case the insured could move the yacht and not lose otherwise applicable coverage as a consequence. Even if Fish's yacht was "in a safe berth afloat" – satisfying Lay-Up subsection (a) – Fish has admitted that he was fueling the boat, although he alleges that he was doing so in order to immediately navigate it directly from Black River Yacht Club to J&B Landing, which was only 75-100 yards away. (Mid-Century acknowledges that J&B Landing would have been a permissible lay-up location – indeed, the *only* permissible lay-up location in its view.) If a reasonable factfinder believed that Fish had the boat "available for immediate navigation" only for the purpose of bringing it to its primary mooring place (J&B Landing) for winterizing and storage until the end of the lay-up period the following spring, i.e. only "for the purposes of safety", Fish then would not lose otherwise applicable coverage. Conversely, if the factfinder *dis*believed Fish's allegation and found instead that he was making the vessel "available for immediate navigation" for recreational purposes – rather than for the "safety" purpose of bringing it to J&B for winterizing and secure, protected storage – the factfinder would be compelled to determine that Fish is not entitled to coverage under the Mid-Century policy. Mid-Century's briefs, however, no where mention Lay-Up provision subsection (c). Instead, Mid-Century's briefs rely on the inaccurate argument that the lay-up provision "provided", without qualification, "that the boat would be out of the water by October 1 of the applicable policy year."

Thus, whether or not Mid-Century might have had an argument for denying coverage under lay-up subsection (c), it failed to make such an argument in its brief, let alone its opening brief. Except where subject-matter jurisdiction appears to be lacking, it is not the court's role to create and develop arguments for the parties, and the court will not do so here. Mid-Century has waived any argument that lay-up subsection (c) bars coverage. *See US v. Lockett*, 359 F. App'x 598, 613 (6th

Cir. 2009) (arguments raised for the first time in a reply brief are consistently disregarded in our circuit) (citing, *inter alia, American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004)), *cert. denied*, – U.S. –, 130 S.Ct. 2420 (2010); *Maher v. Int'l Paper Co.*, 600 F. Supp.2d 940, 948-49 with n.4 (W.D. Mich. 2009) (arguments not raised in briefs may not then be raised at oral argument) (citing, *inter alia*, *US v. Bowen*, 194 F. App'x 393, 401 n.2 (6th Cir. 2006) (Daughtrey, Cook, <u>Chief D.J. Collier</u>) ("This argument was waived by Bowen's failure to raise it at any time before oral argument.") (citing *US v. Bender*, 265 F.3d 464, 475 (6th Cir. 2001))).

**DISCUSSION:  FARMERS INSURANCE EXCHANGE'S UMBRELLA POLICY.**

Farmers moves for summary judgment, seeking a declaration that it is not obligated to defend or indemnify Fish as to *any* losses under the umbrella policy it issued to him, for three reasons.

First, paragraph six of the coverage section expressly excludes coverage arising from the ownership, operation, maintenance, etc., of any watercraft which is more than 26 feet long or powered by a motor more than 50 horsepower strong, and it is undisputed that Fish's yacht in question was 42 feet long and powered by a motor with more than 50 horsepower.

Second, this exclusion has an exception (Coverage ¶ 6a) which allows coverage "if such damages are covered by underlying insurance scheduled in the Declarations of this policy."  It is undisputed that the umbrella policy's Declarations page did <u>not</u> list the underlying policy which covered Fish's yacht.  Rather, the umbrella policy's Declarations page listed two other policies: a homeowner's policy covering Fish's pontoon boat, and a special motorboat policy covering a motorboat other than the 42-footer destroyed in the instant accident.

Third, this same exclusion has a provision (Coverage ¶ 6b) which provides that the umbrella

policy coverage "is no broader than the underlying policy, except for our Limit of Liability." Today's opinion holds that Fish is entitled to coverage under Mid-Century's "Yacht Secure" policy (the "underlying policy"), however, so Umbrella Policy Coverage ¶ 6b does not help Farmers Insurance Exchange.

As to the loss of Fish's yacht only, Farmers advances a fourth reason why it is not obligated to defend or indemnify Fish under the umbrella policy: ¶ 7a of the umbrella policy's coverage section expressly excludes coverage for "property owned by any insured", and it is undisputed that the yacht in question was owned by Fish.

**Fish has no response at law to Farmers Insurance Exchange's denial of coverage due to the yacht's length and engine horsepower. But Fish advances a colorable argument that subsequent conduct by Farmers Insurance Exchange should equitably estop it from invoking the unambiguous policy provisions noted above.** Specifically, Fish argues that Farmers is estopped from denying coverage under the umbrella policy because they published and provided him with copies of a "Deck Sheet" for that policy for the November 2007-November 2008 and the November 2008-November 2009 policies. *See* Fish's Opp, Exs A and B. Fish elaborates as follows:

> Those deck sheets clearly evidence that Mr. Fish was covered for (2) power boats. The (2) power boats Mr. Fish owned were:
>
> •      1973 200 hp 42' 5" Trojan Motor Yacht;
> •      175 hp 18' Four Winns; and
>
> Mr. Fish also owned a 25 hp pontoon boat that was covered by his home owner's insurance, Fire Insurance Exchange, *see* Exhibit C.
>
> Before such time as Farmers would insure Mr. Fish's 42' 5" Motor Yacht, they required an inspection-survey, Exhibit[s] D and E. Those were provided to Farmers circa April 2004 and June 2005.
>
> Farmers, in their Request to Admit [sic, their response to Fish's Request for

Admissions], admitted they received the surveys for the 42" 5' motor yacht, *see* Exhibit F.

From and after 2005 Farmers annually provided Mr. Fish with deck sheets of the Personal Umbrella Policy evidencing that Mr. Fish had 2 power boats covered via the Umbrella Policy.

As per Mr. Fish's affidavit, Exhibit G, he had every reason to rely on the Farmers Deck sheets [to conclude] that he had umbrella coverage for the 42" 5' motor yacht.

Michigan courts have recognized that in certain situations, estoppel or waiver may operate to hold a Defendant liable for coverage that may differ from the expressed terms of the contract, *Parmet Homes, Inc. v. Republic Insurance Company*, 111 Mich. App. 140, 314 NW2d 453 (1981). *See also In[d]ustro Motive Corp. v. Morris Agency & Globe Insurance Co.*, 76 Mich[.] App. 390, 256 NW2d 607 (1977) where the Court of Appeals concluded that Defendant/carriers could not assert the policies [sic, should be "policy's"] 80% contribution factor where Plaintiff's [sic] cancelled their former coverage in reliance on 1) the agreement with the agency and 2) the binder[,] both of which promised coverage identical to Plaintiff's prior insurance. The Court further stated:

> *"The instant Plaintiff's [sic] had a right to rely on the synopsis they furnished defendants and on the binder they received, unless and until their attention was directed to changes in coverage"*

*Industro Motive*[, 76 Mich[.] App. 390,] *396*[, 256 N.W.2d 607.]

Here, Fish provided Mid-Century and Farmers with the inspection-survey both insurance carriers required. Farmers subsequently issued annual deck sheets evidencing that he had umbrella coverage for (2) power boats! It was not until 14 months after the October 2008 loss that Fish was provided, through his attorney, the Personal Umbrella Policy which limited coverage to a boat under 26' [sic, should be *sixteen* feet] or [sic, should be "and"] less than 50 hp.

Fish's Opp to Farmers' MSJ at 6-8. Farmers Insurance Exchange did not file a reply brief in support of its motion for summary judgment.

<u>Should Farmers Be Estopped from Invoking the Applicable Exclusions?</u> The principle of estoppel is an equitable defense which prevents one party to a contract from enforcing a specific provision of the contract. *See Morales v. Auto-Owners Ins. Co.*, 458 Mich. 288, 295, 582 N.W.2d

776, 779 (Mich. 1998). For equitable estoppel to apply against an insurer in favor of an insured, the party asserting estoppel must establish that (1) the insurer's actions or representations induced the insured to believe that an otherwise applicable exclusion clause would not be invoked and that coverage would be provided, (2) the insured justifiably relied on this belief, and (3) the insured was prejudiced by its reliance on this belief. *See Fleckenstein v. Citizens' Mut. Auto. Ins. Co.*, 326 Mich. 591, 599, 400 N.W.2d 733 (Mich. 1950); *Auto Owners Ins. Co. v. Ferwerda Enters., Inc.*, 283 Mich. App. 243, 257, 771 N.W.2d 434, 443 (Mich. App.) (citing *Gross Pointe Park v. Michigan Munic. Liab. & Prop. Pool*, 473 Mich. 188, 204, 702 N.W.2d 106, 116 (Mich. 2005) (J. Cavanagh for an equally divided Court, joined by JJ. Weaver and Kelly, with three Justices separately concurring only in the result, and J. Corrigan not participating), *rev'd on other grounds*, 485 Mich. 905, 773 N.W.2d 17 (Mich. 2009).

Justifiable reliance means *reasonable* reliance, *Divergilio v. Charter Twp. of West Bloomfield*, 2006 WL 3103012, *7 (Mich. App. Nov. 2, 2006) (per curiam) (P.J. Fitzgerald, Markey, Talbot) (citing *Adams v. Detroit*, 232 Mich. App. 701, 708, 591 N.W.2d 67, 70 (Mich. App. 1998)), *app. denied*, 480 Mich. 949, 741 N.W.2d 302 (Mich. 2007), *recon. denied*, 480 Mich. 1077, 744 N.W.2d 132 (Mich. 2008), and it is a general rule of Michigan equity that "'where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.'" *Rix v. O'Neil*, 366 Mich. 35, 42, 113 N.W.2d 884, 887 (Mich. 1982) (quoting *Sheffield Car Co. v. Constantine Hydraulic Co.*, 171 Mich. 423, 450, 137 N.W. 305, 315 (Mich. 1912)).

"Generally, after an insurance company denies coverage to an insured and states its defenses, it is estopped from raising new defenses." *Makki v. Farmers Ins. Exchange*, 2005 WL 26993, *2 (Mich. App. Jan. 6, 2005) (per curiam) (P.J. Markey, Fitzgerald, Owens) (citing *Smit v. State Farm*

*Ins. Co.*, 207 Mich. App. 674, 679-80, 525 N.W.2d 528, 530 (Mich. App. 1994) (citing *Lee v. Evergreen Regency Cooperative*, 151 Mich. App. 281, 285, 390 N.W.2d 183, 185 (Mich. App. 1986))), *app. denied*, 474 Mich. 913, 705 N.W.2d 351 (Mich. 2005). "But an insurance company is not estopped from raising defenses where the effect of estoppel would require the insurance to cover a loss it never agreed to cover." *Makki*, 2005 WL 26993 at *2 (citing *Smit*, 207 Mich. App. at 680, 525 N.W.2d 528). As the Michigan Court of Appeals has noted, *see Lee*, 151 Mich. App. at 285, 390 N.W.2d at 185, the application of insurer equitable estoppel and waiver was sharply limited long ago in *Ruddock v. Detroit Life Ins. Co.* 209 Mich. 638, 177 N.W.2d 242 (Mich. 1920):

> In that case, the Court explained that the cases applying the "doctrine [sic] of waiver and estoppel" had primarily been ones that involved the insurer's assertion that the contract had been forfeited because of noncompliance with conditions of the contract. The Court distinguished those cases and held that waiver and estoppel are not available where their application would result in broadening the coverage of a policy, such that it would "cover a loss it never covered by its terms . . . [and] create a liability contrary to the express provisions of the contract the parties did make."

*Smith*, 207 Mich. App. at 680, 525 N.W.2d at 530-31 (quoting *Ruddock*, 209 Mich. at 654, 177 N.W. 242) (nn. 3 &4 omitted). In *Ruddock*, which is still good law, the Michigan Supreme Court further reasoned that

> [a]fter a loss accrues, an insurance company may, by its conduct, waive a forfeiture; or by some act before such loss it may induce the insured to do or not to do some act contrary to the stipulations of the policy, and thereby be estopped from setting up such violation as a forfeiture; but *such conduct, though in conflict with the terms of the contract of insurance and with the knowledge of the insured and relied upon by him, will not have the effect to broaden out such contract so as to cover additional objects of insurance or causes of loss.*

*Ruddock*, 209 Mich. at 655, 177 N.W. at 248 (quoting *McCoy v. Northwestern Mut. Ben. Ass'n*, 66 N.W. 97 (Wis. 1896)) (emphasis added). Here, Farmers Insurance Exchange contends that it did not deny coverage on the basis of Fish failing to comply with some condition which the policy

required for him to collect on coverage which in fact existed under the policy. Rather, Farmers maintains that it denied coverage on the simpler and potentially stronger ground – not subject to estoppel or waiver – that the policy clearly never extended coverage for Fish's yacht in the first place, due to its length exceeding 26 feet (Umbrella Policy ¶ 6), the horsepower rating of its motor exceeding 50 HP (again Umbrella Policy ¶ 6), the absence of the "underlying insurance" (the Mid-Century "Yacht Secure" policy) from the umbrella policy's Declarations section (Umbrella Policy ¶ 6a), and with respect to Fish's yacht itself, due to the fact that the yacht was owned by the insured (Umbrella Policy ¶ 7a).

Nonetheless, this record does not permit the court to conclusively rule on Fish's attempt to impose, and Farmers Insurance Exchange's attempt to avoid, equitable estoppel. These parties failed to provide *admissible evidence* – whether submitted as attachments to their briefs, as they should have been, or even belatedly submitted at oral argument – to substantiate their allegations relevant to estoppel. It is well settled in our circuit that "'[a]ssertions by counsel do not constitute probative evidence.'" *JDC Mgmt., LLC v. Reich*, 644 F. Supp.2d 905, 929 with n. 19 (W.D. Mich. 2009) (quoting *In re Cohara*, 324 B.R. 24, 28 (6th Cir. BAP 2005) and citing, *inter alia*, *Johnson v. Bell*, 525 F.3d 466, 485 (6th Cir. 2008) (noting with approval a jury instruction that "[s]tatements, arguments, and remarks of counsel . . . are not evidence"), *cert. denied*, – U.S. –, 129 S.Ct. 1668, *reh'g denied*, – U.S. –, 129 S.Ct. 2427 (2009)); *see also Urban Assocs., Inc. v. Standex Electronics, Inc.*, 216 F. App'x 495, 508 (6th Cir. 2007); *see, e.g., DeJager Const., Inc. v. Schleininger*, 1996 WL 73168, *8 (W.D. Mich. Mar. 13, 1996) (Quist, J.) ("Statements of counsel, while binding as stipulations or concessions if made in open court or in writing, are not 'evidence' . . . . They are mere argument."). The rule would be the same if the parties were seeking summary

disposition in state court.  *See People v. Brown*, 267 Mich. App. 141, 153, 703 N.W.2d 230, 239 (Mich. App. 2005) (P.J. Richard Allen Griffin, joined by J. Bandstra) (approving of jury instruction that "the lawyers' questions, comments, and arguments were not evidence; rather they were only a means to assist the jury in understanding the evidence and legal theories of both parties.").

Specifically, Fish's counsel alleges that at the request of both Mid-Century and Farmers Insurance Exchange, Fish had a special inspection of the yacht performed, implying there was an understanding that the yacht would be covered under the umbrella policy if the inspection was satisfactory.  Fish's counsel further stated that after the inspection, "the agent" who procured and sold the umbrella policy to Fish assured him that the yacht was now covered under the umbrella policy.  Yet Fish's counsel has failed to submit an affidavit from Fish about the inspection and any alleged communications between him, the agent, and the insurers about the inspection, who asked for or required the inspection, and its effect in adding the yacht to the umbrella policy.  Nor has Farmers Insurance Exchange submitted and discussed any affidavits or deposition testimony regarding such communications or the absence thereof.

Moreover, neither Fish nor Farmers Insurance Exchange has filed any admissible evidence identifying "the agent" who allegedly told Fish that the yacht had been added to the umbrella policy.  Much less have these parties submitted admissible evidence showing whether "the agent" was an employee or otherwise an agent (in the legal sense) of Farmers Insurance Exchange or Mid-Century.  Under Michigan law, those facts could affect whether the agent's representations could bind the insurer and whether it was reasonable for Fish to rely on the agent's alleged assurance of coverage.  "Because a corporation may only act through its officers and agents, an agency relationship exists between a corporation and its officers", *Miller v. Herskovic*, 2006 WL 2006 WL 3498422, *2 (Mich.

App. Dec. 5, 2006) (per curiam) (P.J. Cavanagh, Bandstra, Owens) (citing *Bruun v. Cook*, 280 Mich. 484, 495-96, 273 N.W. 774, 779 (Mich. 1937), and the corporation is "responsible for the acts of its agents done within the scope of the agent's authority", *Dick Loehr's, Inc. v. Michigan Sec'y of State*, 180 Mich. App. 165, 168, 446 N.W.2d 624 (Mich. App. 1989)).  *See also Ivory v. Wayne Cty.*, 2010 WL 2077142, *3 (Mich. App. May 25, 2010) (per curiam) (P.J. Murphy, K.F. Kelly, Stephens) ("Generally speaking, '[i]n agency law, the principal and his agent share a legal identity; it is a fundamental rule that the principal is bound, and liable for, the acts of his agent done with the actual or apparent authority of the principal.'") (quoting *People v. Konrad*, 449 Mich. 263, 280-81, 536 N.W. 2d 517 (Mich. 1995) (J. Brickley, dissenting on other grounds) (citing, *inter alia*, *People v. Aaron*, 409 Mich. 672, 731, 299 N.W.2d 304 (Mich. 1980))).  The agent could have had express actual authority, implied actual authority, or apparent authority to bind Farmers Insurance Exchange. *See Shaler Interiors v. MKK Techs., Inc.*, 2010 WL 173637, *2 (Mich. App. Jan. 19, 2010) (citing *Alar v. Mercy Mem. Hosp.*, 208 Mich. App. 518, 528, 529 N.W.2d 318, 323 (Mich. App. 1995)).

Finally, Fish's counsel alleges that Fish never saw the umbrella policy until after the October 5 explosion, yet he fails to file and *cite* deposition or affidavit testimony from Fish to that effect. Conversely, Farmers Insurance Exchange fails to present any proof that it presented or transmitted the umbrella policy to Fish, and when it did so.  And neither party submits any admissible evidence regarding whether Fish ever requested a copy of the policy, let alone cites Michigan precedent as to whether estoppel might be affected by the presence or absence of such a request.

As a consequence, the court cannot determine whether either insurer's actions or representations induced Fish to believe that the yacht was covered under the umbrella policy despite

the policy terms to the contrary, which is the first element of equitable estoppel, *Fleckenstein*, 326 Mich. at 599, 400 N.W.2d 733. Nor can the court determine whether it was *justifiable* for Fish to rely on the belief thus created, which is the second element of equitable estoppel, *Ferwerda*, 283 Mich. App. at 257, 771 N.W.2d at 443. Accordingly, neither party is entitled to summary judgment on Fish's counterclaim for coverage under the Farmers Insurance Exchange umbrella policy. The parties are encouraged to reach an amicable resolution without the need for further litigation.

### ORDER

Defendant Jim A. Fish's motion for summary judgment **[doc #70] is GRANTED in part** and **DENIED in part** as explained below:

**As to Mid-Century Insurance Company "Yacht Secure" policy #FY-70113271:**

Plaintiff Mid-Century Insurance Co.'s motion for summary judgment **[#68] is DENIED.**

Defendant Jim A. Fish's motion for summary judgment **[doc #70] is GRANTED.**

The court **DECLARES** that Jim A. Fish is entitled to coverage with respect to losses "arising out of the ownership, maintenance, or use of the insured yacht . . . resulting in: (1) bodily injury; or (2) property damage; or (3) pollution", namely losses occasioned by the October 5, 2008 explosion of said yacht at the Black River Yacht Club.

**As to Farmers Insurance Exchange umbrella policy # FY-701132719 :**

Counterclaim-Defendant Farmers Insurance Exchange's motion for summary judgment on Fish's counterclaim **[doc # 69] is DENIED without prejudice**.

Counterclaimant Fish's motion for summary judgment on his counterclaim **[#70] is DENIED**

**without prejudice**.

      **Surviving for trial is** Jim Fish's counterclaim for coverage under Farmers Insurance Exchange umbrella policy #FY-701132719.


      The pretrial conference scheduled for Monday, November 8, 2010 is **VACATED** *sine die*.

      The trial scheduled to commence on Tuesday, November 30, 2010 is **VACATED** *sine die*.

      This is <u>not</u> a final and immediately appealable order.

      **IT IS SO ORDERED** on this 1st day of September, 2010.

/s/ Paul L. Maloney        
Honorable Paul L. Maloney
Chief United States District Judge
